# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | No. 3:18-bk-07868 |
| | ) | |
| **CHRISTOPHER ROBERTS KELLY,** | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **MICHELE SEXTON** and | ) | |
| **BRANT GAMBLE,** | ) | |
| derivatively on behalf of Legacy Physician | ) | |
| Partners, LLC, | ) | |
| | ) | |
| **MICHELE SEXTON,** | ) | |
| in her individual capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **BRANT GAMBLE,** | ) | Adv. Pro. No._____ |
| in his individual capacity, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CHRISTOPHER ROBERTS KELLY,** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Come now Michele Sexton and Brant Gamble ("Plaintiffs"), by and through counsel, individually and derivatively on behalf of Legacy Physician Partners, LLC ("Legacy"), pursuant to Section 523 of the United States Bankruptcy Code, and hereby submit this Complaint to Determine Dischargeability of Debt. In support of this Complaint, Plaintiffs would show the Court as follows:

- 1 -

## JURISDICTION & VENUE

1. On November 26, 2018 (the "Petition Date"), Debtor Christopher Roberts Kelly ("Debtor") filed with this Court a voluntary petition for relief under Chapter 11 of Title 11 (the "Bankruptcy Code") of the United States Code.

2. This adversary proceeding is a core proceeding as defined by Section 157(b)(2)(I) of Title 28 of the United States Code. This Court has jurisdiction over this matter pursuant to Sections 157 and 1334 of Title 28 of the United States Code and Section 523 of the Bankruptcy Code. Venue is proper in this Court pursuant to Sections 1408, et seq. of Title 28 of the United States Code.

## INTRODUCTION

3. The Debtor and the Plaintiffs are among the parties to the civil action *Michele Sexton, et al. v. Christopher Kelly, et al.*, case number 47696 (the "State Litigation") pending in the Chancery Court for Williamson County, Tennessee (the "State Court"). A copy of the First Amended Verified Complaint (the "Amended Complaint") in the State Litigation is **attached hereto as Exhibit A**. Plaintiffs incorporate by reference the allegations of Paragraph 14 through Paragraph 82 of the Amended Complaint as if fully stated herein.

4. As described in the Amended Complaint, Plaintiffs' claims in the State Litigation regard, among other things, Debtor's fraudulent actions in coercing Plaintiffs to sign an altered version of Legacy's operating agreement.

5. Debtor subsequently used the altered operating agreement to oppress Plaintiffs and to attempt to coerce Plaintiffs into relinquishing their proceeds—arising from a potential sale of Legacy—to Debtor in exchange for nominal payment. Debtor stated that if Plaintiffs refused

Debtor's offer, Debtor would destroy Legacy. Debtor took several actions to do so after Plaintiffs refused.

6. Debtor then purported to terminate Plaintiffs' employments with Legacy and forcefully acquire their membership interests by purchasing the same for $1,000 each, a value far below the market value of Plaintiffs' membership interests.

7. Subsequent to the filing of the Amended Complaint, and subsequent to Debtor's purported acquisition of Plaintiff's membership interests in Legacy, Debtor sold or caused Legacy to sell substantially all of the assets of Legacy, generating proceeds to which Plaintiffs are entitled and would possess but for Debtor's fraudulent activity.

8. Debtor's misconduct as a fiduciary of Legacy, including Debtor's efforts to destroy Legacy in fulfillment of his vow to do so, has also damaged Legacy.

## FACTUAL BACKGROUND

**A. Debtor fraudulently altered the Original Agreement.**

9. Legacy provides emergency room staffing to hospitals.

10. Legacy's formation was a collaborative effort between Plaintiffs, Debtor, and Donald Bivacca, who discussed formation of the company and the company's governance and operating terms.

11. Upon agreement on the purpose of their soon-to-be-formed company and its terms of operation (the "Original Agreement"), they formed Legacy and began operating.

12. Sexton, Gamble, and Debtor agreed to be members of Legacy with membership interests of 20%, 20%, and 22.5%, respectively.

13. In addition to membership, Plaintiffs and Debtor agreed that Gamble, Debtor, and Bivacca, would also be Legacy's managers. Plaintiffs would also be employees responsible for coordinating emergency room staffing needs with Legacy's available personnel.

14. Legacy was formed on February 21, 2017 and began operating according to the terms of the Original Agreement without it having been memorialized, and without Plaintiffs' employment agreements having been memorialized. Despite Plaintiffs' at least 30 requests of Debtor to receive physical copies of documents evidencing the Original Agreement and their employment agreements, they received neither.

15. Nevertheless, Plaintiffs emerged as Legacy's driving forces, transforming the relationships they alone had into all of Legacy's first 10 business contracts.

16. On May 23, 2017 at or about 3:02pm, Plaintiffs received a call from Debtor, who stated that they needed to memorialize and sign the Original Agreement that afternoon.

17. Debtor presented Plaintiffs with the Altered Agreement and stated that it was imperative that Plaintiffs sign it that day, as failure to have a written agreement would prevent them from finalizing payroll. Sexton noted that the Altered Agreement did not include many of the material terms of the Original Agreement, but Debtor assured her that any necessary changes would occur after Plaintiffs signed. In fact, Debtor had no intention of modifying the Altered Agreement, written heavily in his favor. He purposefully presented the Altered Agreement to Plaintiffs in this manner to coerce them into signing it without the ability to review all of its terms.

18. Because failure to finalize payroll would jeopardize Legacy's first impression as an emergency room staffing service during its first contract, and because Debtor assured them the necessary changes to the Altered Agreement would be made, Plaintiffs signed the Altered Agreement in the stress of the then-present circumstances, though Legacy's operations largely

continued in accordance with the Original Agreement. The Altered Agreement is attached to the Amended Complaint as Exhibit A.

19. Due to Debtor's coercive tactic, Plaintiffs had less than an hour to review the 61-page agreement and were not afforded an opportunity to discuss the agreement with counsel or other advisors.

20. During their short review of the Altered Agreement, Plaintiffs noticed that, although the membership interests of the Original Agreement were correctly stated in the Altered Agreement, only Debtor and Bivacca were listed as Legacy's managers, whereas Gamble was also a manger under the Original Agreement.

21. Upon later examination of the Altered Agreement, Plaintiffs discovered, contrary to Debtor's assurance, that the Altered Agreement provided no path for Gamble to become a manager.

22. Plaintiffs discovered other provisions that were not included in or different from those in the Original Agreement, including a choice of law provision stating that Delaware law governed the Altered Agreement, and a forum selection clause selecting the state and federal courts of Delaware. Ex. A, Ex. A §§ 15.11, 15.12.

23. Another such provision includes section 10.05 (the "Unit Purchase Provision"), which states:

> At any time prior to the consummation of a Change of Control, following the termination of employment or other engagement of any Service Provider with the Company, the Company may, at its election, require the Service Provider . . . to sell to the Company all or any portion of such Service Provider's Units or Incentive Units at the following respective purchase prices:
>
> (i) For the Restricted Incentive Units, under all circumstances of termination, a price equal to the

> > lesser of their Fair Market Value and One Dollar ($1) (the 'Cause Purchase Price').
>
> > (ii) For the Units or Unrestricted Incentive Units, their Cause Purchase Price, in the event of:
> >
> > > (A) the termination of such Service Provider's employment or other engagement by the Company for Cause; or
> > >
> > > (B) the resignation of such Service Provider for any reason.

Id. Ex. A § 10.05.

24. Another such provision is section 11.02 (the "Restrictive Covenants"), which states that Legacy members, while owning interests in Legacy and for two years thereafter, may not solicit Legacy's employees or clients, and that those members, while owning interest in Legacy and for one year thereafter, may not compete with Legacy. Id. Ex. A § 11.02.

25. As described below, Debtor attempted to use the Unit Purchase Provision and the Restrictive Covenants to freeze Plaintiffs out of a sale of Legacy and unlawfully force Plaintiffs to terminate their relationship with Legacy.

26. Debtor employed a similar sign-under-duress tactic regarding Sexton's employment agreement. Debtor presented Sexton with an agreement that was almost unrecognizable in comparison with Sexton's original employment agreement, and Sexton was forced to sign the agreement without sufficient review or corrective recourse in order to avoid Debtor's ultimatum that she must sign or forgo her pay.

**B.  Debtor threatened, and acted, to destroy Legacy.**

27. In February 2018, Legacy received an offer from a willing and qualified buyer ("Buyer") to purchase Legacy. Buyer made an offer to purchase Legacy for cash payable at closing and an "earnout" payable if Legacy met certain milestones in the months following closing.

- 6 -

4830-1123-6489.2
Case 3:18-bk-07868   Doc 63   Filed 03/05/19   Entered 03/05/19 10:13:16   Desc Main Document   Page 6 of 12

28. Debtor approached Sexton regarding the offer and proposed that he and Bivacca would receive all cash from the sale if Plaintiffs agreed to receive the earnout.

29. Sexton saw this as an opportunity to separate herself from Debtor and the hostile workplace that he had created in the months preceding Buyer's offer. After discussion between them, Plaintiffs sought to accept Debtor's offer.

30. Upon contacting Debtor to do so, Debtor made a new offer that if Plaintiffs wished to consummate the transaction, they would simply have to forfeit their cash proceeds from the sale—a combined 40% interest—to Debtor and receive nothing.

31. Debtor stated that if Plaintiffs did not agree, he would ensure that contracted providers that Plaintiffs had brought to Legacy would not get paid, key employees (including Sexton's niece) would be terminated, and that he would decrease Sexton's pay. Indeed, Debtor made clear that Plaintiffs' failures to accept his offer would result in Legacy's destruction.

32. Debtor's threats were not mere conjecture. Since then, Debtor has caused Legacy to fail to pay its emergency room contractors, has caused approximately 25 of Legacy's vendors and providers to threaten to suspend providing services to Legacy and Legacy's clients and has caused other service providers to completely terminate their contracts with Legacy. One such termination is attached to the Amended Complaint as Exhibit B.

33. With respect to Sexton in her personal capacity, Debtor also stated that her refusal to accept his offer would cause him to "make her life hell." In line with this threat, Debtor has purposefully caused certain Legacy employees to be paid in an untimely manner and fired two employees with whom Sexton was close for the purpose of creating a difficult working environment for Sexton.

## C. Debtor purported to terminate Plaintiffs and purchase their membership interests.

34. Debtor's foregoing actions were not only an attempt to force Plaintiffs to accept his offer connected with the sale of the company, but an attempt to get them to quit.

35. Pursuant to the Unit Purchase Provision, if Plaintiffs quit, Debtor could purchase their membership interests for $1, each. Ex. A, Ex. A § 10.05.

36. Pursuant to the Restrictive Covenants, if Debtor purchased Plaintiffs' membership interests, Plaintiffs would both allegedly be prohibited from competing with Legacy for one year after Debtor's purchase, and Plaintiffs would both allegedly be prevented from soliciting Legacy clients and employees for two years after Debtor's purchase. Id. Ex. A § 11.02.

37. Debtor's actions in encouraging Plaintiffs' termination in order to purchase their membership interests for $1 each was an attempted work-around to accomplish his offer in connection with the sale of Legacy to Buyer. In fact, upon information and belief, Debtor communicated with Bivacca his intent to fire both Plaintiffs with the ultimate goal of robbing them of their ownership interests. Bivacca revealed to Sexton an email in which Debtor explained Debtor's intent to fire Plaintiffs and reallocate their shares to Bivacca and Debtor to, upon information and belief, "make [them] rich."

38. In line with Debtor's attempts to purchase Plaintiffs' ownership interests for *de minimus* sums, Debtor and/or Bivacca obtained two cashier's checks in the amount of $1,000 each as recently as August 22, 2018 with the intent to purchase Plaintiffs' ownership interests for far less than market value.

39. Eventually, in conformity with his pattern of oppressive behavior designed to exert control and freeze out Plaintiffs, Debtor also terminated Gamble's employment.

4830-1123-6489.2
Case 3:18-bk-07868    Doc 63    Filed 03/05/19    Entered 03/05/19 10:13:16    Desc Main
Document      Page 8 of 12

40. Since Gamble's termination, Debtor has refused to pay Gamble wages he earned before termination.

41. Moreover, funds have disappeared from Legacy's bank accounts without any explanation or under false pretenses. For instance, $40,000 that was allocated and debited for the payment of a vendor turned out to be a false account number; the funds remain missing. Debtor had previously told Plaintiffs that he had purchased cyber insurance although Legacy never obtained a cybersecurity insurance policy. Debtor and Bivacca had previously been advised that Legacy's computer system and email had been compromised when an account linked to Debtor had been sending out emails to employees and vendors. Gamble alerted Debtor and Bivacca at the time and furthermore Gamble recommended securing an information technology expert to rectify the situation and secure the system, but Debtor refused.

42. Legacy has also failed to obtain director and officer insurance, despite Debtor's representations to Plaintiffs that Legacy had purchased the same.

43. More recently, the Company's bank account has been unable to be reconciled, indicating a $125,000 shortfall.

44. After learning of the imminent filing of the lawsuit initiating the State Litigation, in a desperate attempt to conceal his fraudulent misconduct and financial mismanagement, Debtor purported to terminate Sexton "for cause" via email (attached to the Amended Complaint as Exhibit C). Then, because the State Court restrained Debtor from completing such termination, Debtor purported to terminate Sexton *without* cause.

45. Debtor's motive in attempting to terminate Plaintiffs, cause or not, was to take their membership interests under the Unit Purchase Provision, despite his inability to do so because of the provision's invalidity due to Plaintiffs' duress in "agreeing" to it, and despite that Debtor's for-

cause termination of Sexton was improper under the Altered Agreement and therefore could not give rise to his ability to purchase her membership interest. Debtor and Bivacca have tendered to Plaintiffs the $1,000 checks in an effort to complete such purchase far below fair market value therefore making the attempted buy-out ineffective.

**D.      Debtor sold all or substantially all of Legacy's assets.**

46.     In October 2018, in the State Litigation, Plaintiffs filed Plaintiffs' Second Motion for Temporary Restraining Order and for Temporary Injunction (the "Second TRO Motion") in order to prevent Legacy from selling assets to which Plaintiffs may be entitled.

47.     The State Court then entered the Agreed Order Requiring Notice of Sale and Holding Motion for Temporary Restraining Order in Abeyance Pending Receipt of Same (the "Notice of Sale Order").  The Notice of Sale Order required Debtor to provide Plaintiffs with "notice of any sale of the equity or substantially all of the assets of LPP, or a substantially equivalent transaction, including retirement of debt, no less than fifteen (15) days prior to the closing of the sale."  The Notice of Sale Order is **attached hereto as Exhibit B**.

48.     Debtor nevertheless sold Legacy's assets in violation of the Notice of Sale Order. Thus, the State Court entered the Order on Defendants' Violation of Notice of Sale Order (the "Violation Order"), requiring Legacy to "interplead all funds to which Legacy claims ownership." The Violation Order is **attached hereto as Exhibit C**.

49.     Upon information and belief, Legacy's assets were sold at Debtor's direction, or Debtor played an instrumental role in accomplishing the same.

50.     Upon information and belief, Debtor's purpose in causing Legacy to sell its assets, or contributing to the same, was to complete his plot to profit from his purported and fraudulent acquisition of Plaintiffs' membership interests in Legacy.

4830-1123-6489.2

Case 3:18-bk-07868    Doc 63    Filed 03/05/19    Entered 03/05/19 10:13:16    Desc Main
Document      Page 10 of 12

## NON-DISCHARGEABILITY

51. Debtor is liable to Plaintiffs individually, as Debtor's foregoing actions in (1) fraudulently coercing Plaintiffs to sign the Altered Agreement in order to use the provisions thereof to oppress Plaintiffs and wrongfully take their membership interests, and (2) performing the other acts of misconduct described above resulted in Debtor obtaining money, property, or services from Plaintiffs through false pretenses, false representations, and actual fraud.

52. Debtor is liable to Plaintiffs individually and derivatively on behalf of Legacy, as Debtor's foregoing actions in (1) impeding a sale of Legacy to Buyer due to Plaintiff's failure to accept Debtor's offer to Plaintiffs' in connection with the sale, (2) attempting to destroy Legacy due to Plaintiffs' rejection of Debtor's offer in connection with the sale of Legacy to Buyer, (3) attempting to force Plaintiffs to quit so that Debtor could purchase Plaintiffs' membership interests for $1, and (4) performing the other acts of misconduct described above in violation of his fiduciary duties to Legacy and Plaintiffs constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

53. The resulting obligations of the Debtor to the Plaintiffs are non-dischargeable pursuant to Section 523(a)(2), (4) and (6) of the Bankruptcy Code.

WHEREFORE, Plaintiffs pray that this Court enter judgment:

1. Holding Debtor liable to Plaintiffs and finding the debts described herein non-dischargeable; and

2. Granting Plaintiffs such other and further relief as is just and appropriate.

DATED: March 5, 2019.

                    Respectfully submitted,

                    /s/ Austin L. McMullen
                    Austin L. McMullen
                    BRADLEY ARANT BOULT CUMMINGS LLP
                    1600 Division Street, Suite 700
                    P. O. Box 340025
                    Nashville, Tennessee 37203
                    Phone: (615) 252-2307
                    Fax: (615) 252-6307
                    amcmullen@bradley.com

                    *Attorney for Michele Sexton and Brant Gamble*