IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

FILED
WILLIAMSON COUNTY
MASTER

2010 NOV -1 PM 12: 32

FILED FOR ENTRY

COPY

| | |
|---|---|
| MICHELE SEXTON and<br>BRANT GAMBLE,<br>derivatively on behalf of Legacy Physician<br>Partners, LLC,<br><br>MICHELE SEXTON,<br>in her individual capacity,<br><br>and<br><br>BRANT GAMBLE,<br>in his individual capacity,<br><br>       Plaintiffs,<br><br>v.<br><br>CHRISTOPHER KELLY, and<br>DONALD BIVACCA,<br><br>       Defendants,<br><br>and<br><br>LEGACY PHYSICIAN PARTNERS, LLC<br><br>       Nominal Defendant. | Civil Action No. 47696 |

---

### PLAINTIFFS' FIRST AMENDED VERIFIED COMPLAINT

---

Pursuant to Tenn. R. Civ. P. 15.01, Michele Sexton, and Brant Gamble, individually and derivatively on behalf of Legacy Physician Partners, LLC (collectively, "Plaintiffs"), for their First Amended Verified Complaint against Christopher Kelly and Donald Bivacca, state:

## I.    THE PARTIES

1.    Legacy Physician Partners, LLC ("Legacy") is a limited liability company organized under the laws of the State of Delaware with principal place of business at 5214 Maryland Way Suite 404, Brentwood, Tennessee 37027.

2.      Michele Sexton is, and at all times relevant to this Complaint has been, a member of Legacy and resident of the State of Tennessee, residing at 2037 Universe Court, Nolensville, Tennessee 37135.

3.      Brant Gamble is, and at all times relevant to this Complaint has been, a member of Legacy and resident of the State of Oklahoma, residing at 5918 S. Marion Pl, Tulsa, Oklahoma 74135.

4.      Chris Kelly is a Tennessee attorney whose license to practice is currently suspended. At all times relevant to this Complaint, Kelly has been a manager and member of Legacy and resident of the State of Tennessee, with a last known address of 210 Paddock Lane, Nashville, Tennessee 37205.

5.      At all times relevant to this Complaint, Donald Bivacca has been a manager and member of Legacy and resident of the State of Tennessee, with a last known address of 2455 Durham Manor Court, Franklin, Tennessee 37064.

## II.    **JURISDICTION & VENUE**

6.      This Court has jurisdiction over the parties as all Plaintiffs consent to personal jurisdiction and Kelly and Bivacca reside in the State of Tennessee.

7.      This Court has jurisdiction over this matter pursuant to Tenn. Code Ann. § 16-11-102, because chancery courts have concurrent jurisdiction with circuit courts and this is not an excepted case.

8.      Venue is proper in this county as Legacy's principal place of business is in Williamson County, all relevant actions happened in Williamson County, and Bivacca resides in Williamson County.

4829-1566-3989.3

9.     As detailed in this Complaint, Legacy's operating agreement (the "Altered Agreement") purports to select Delaware courts as the proper venue for any action relating to the Altered Agreement.

10.     Tennessee courts may refuse to entertain forum and venue selection clauses where the selected state would be a substantially less convenient place for the trial of the action or where the selected forum was chosen by misrepresentation or duress. Dyersburg Mach. Works, Inc., v. Rentenbach Eng'g Co., 650 S.W.2d 378, 380 (Tenn. Ct. App. 1983).

11.     Delaware is a substantially less convenient forum for litigating this action as all parties, save Gamble, reside in Tennessee, all relevant conduct took place in Tennessee, and all physical evidence and witnesses are likely to be in Tennessee.

12.     Further, as detailed in this Complaint, the forum selection clause in the Altered Agreement was obtained by misrepresentation and under duress and not part of the parties' original governance and operating terms.

13.     Because Tennessee courts may refuse to entertain forum and venue selection clauses under these conditions, venue is proper before this Court.

### III.     INTRODUCTION

14.     This lawsuit involves Chris Kelly's oppressive behavior as a manager and member of Legacy, including his attempt to freeze-out Sexton and Gamble from participating in Legacy and his mismanagement of Legacy.  Bivacca was informed of this misconduct and failed to take reasonable actions to prevent it.

15.     Kelly's behavior was no sudden surprise.  Since the company's inception, he has engaged in deceptive conduct, including unilaterally changing the terms of the business arrangement that he, Sexton, and Gamble agreed on and forcing Sexton's and Gamble's assent.

3

16.     Since then, Kelly has oppressed, demeaned, and attempted to control Sexton through harassing behavior consisting of, but not limited to, phone calls, texts, stalking behavior, and verbal abuse, and Kelly has even terminated Gamble's employment.  More recently, Bivacca told Sexton that she had no business being in the company's office and should leave, making her feel unwelcome as an employee and member of the company.

17.     Kelly's conduct culminated with his refusal to agree to a sale of the company to a willing and qualified buyer unless Sexton and Gamble agreed to give their sale proceeds to Kelly, and with attempts to pressure Sexton and Gamble into terminating their employment with Legacy and manufacture "cause events" as grounds for Legacy to terminate their employment, allowing him to purchase their membership interests at a *de minimus* price and impose upon them non-compete and non-solicitation covenants.  To date, Kelly and Bivacca have purported to terminate both Sexton and Gamble and have purported to have repurchased their membership interests.

18.     Plaintiffs seek reformation of the Altered Agreement to conform to the terms upon which the parties actually agreed, damages against Kelly and Bivacca for conduct that breached their duties to Legacy and to Sexton and Gamble, damages resulting from Sexton's and Gamble's retaliatory discharges and the purported purchase of their membership interests for *de minimus* amounts, and a declaratory judgment that the restrictive covenants and other provisions in Legacy's operating agreement are null and void as applied to Sexton and Gamble.

## IV.    FACTUAL BACKGROUND

A.     **Kelly unilaterally changed the terms of the parties' business arrangement and acquired Sexton's and Gamble's signatures to the Legacy Altered Agreement under duress.**

19.     Legacy provides emergency room staffing to hospitals.

4

20.     Legacy's formation was a collaborative effort between Sexton, Gamble, Kelly, and Bivacca, who discussed formation of the company and the company's governance and operating terms.

21.     Upon agreement on the purpose of their soon-to-be-formed company and its terms of operation (the "Original Agreement"), they formed Legacy and began operating.

22.     Sexton, Gamble, and Kelly agreed to be members of Legacy with membership interests of 20%, 20%, and 22.5%, respectively.

23.     They also agreed that Legacy's two additional original members, Bivacca and Brady Sturgeon, would have membership interests of 22.5% and 15%, respectively. Upon information and belief, Sturgeon's interest has since been transferred to Kelly and Bivacca, without the other members' consent, with a portion of it going to a factoring company with whom they chose to do business pursuant to an arrangement in which they have a conflict of interest. Kelly and Bivacca also issued themselves "bonus shares" and new Class B shares, some of which were acquired for the purpose of resale, though the Original Agreement prohibited acquisition of shares for the purpose of resale.

24.     Also in disregard of the Original Agreement's requirements, no notice was given to Sexton or Gamble of Sturgeon's transfer to Kelly and Bivacca.

25.     In addition to membership, Sexton, Gamble, and Kelly agreed that Gamble, Kelly, and Bivacca, would also be Legacy's managers.

26.     Sexton and Gamble would also be employees responsible for coordinating emergency room staffing needs with Legacy's available personnel.

27.     Legacy was formed on February 21, 2017 and began operating according to the terms of the Original Agreement without it having been memorialized, and without Sexton's or

5

Gamble's employment agreements having been memorialized. Despite Sexton's and Gamble's at least 30 requests of Kelly to receive physical copies of documents evidencing the Original Agreement and their employment agreements, they received neither.

28. Nevertheless, Sexton and Gamble emerged as Legacy's driving forces, transforming the relationships they alone had into all of Legacy's first 10 business contracts.

29. On May 23, 2017 at or about 3:02pm, Sexton and Gamble received a call from Kelly, who stated that they needed to memorialize and sign the Original Agreement that afternoon.

30. Kelly presented Sexton and Gamble with the Altered Agreement and stated that it was imperative that Sexton and Gamble sign it that day, as failure to have a written agreement would prevent them from finalizing payroll. Sexton noted that the Altered Agreement did not include many of the material terms of the Original Agreement, but Kelly assured her that any necessary changes would occur after she and Gamble signed. In fact, Kelly had no intention of modifying the Altered Agreement, written heavily in his favor. He purposefully presented the Altered Agreement to Sexton and Kelly in this manner to coerce them into signing it without the ability to review all of its terms.

31. Because failure to finalize payroll would jeopardize Legacy's first impression as an emergency room staffing service during its first contract, and because Kelly assured them the necessary changes to the Altered Agreement would be made, Sexton and Gamble signed the Altered Agreement in the stress of the then-present circumstances, though Legacy's operations largely continued in accordance with the Original Agreement. The Altered Agreement is **attached hereto as Exhibit A**.

6

32.     Due to Kelly's coercive tactic, Sexton and Gamble had less than an hour to review the 61-page agreement and were not afforded an opportunity to discuss the agreement with counsel or other advisors.

33.     During their short review of the Altered Agreement, Sexton and Gamble noticed that, although the membership interests of the Original Agreement were correctly stated in the Altered Agreement, only Kelly and Bivacca were listed as Legacy's managers, whereas Gamble was also a manger under the Original Agreement.

34.     Upon later examination of the Altered Agreement, Sexton and Gamble discovered, contrary to Kelly's assurance, that the Altered Agreement provided no path for Gamble to become a manager.

35.     Sexton and Gamble discovered other provisions that were not included in or different from those in the Original Agreement.  One such provision was section 15.11 (the "Choice of Law Provision"), which states, in part, that "[a]ll issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed and construed in accordance with the internal laws of the State of Delaware . . . ." Ex. A § 15.11.

36.     Another provision that was not part of the Original Agreement was section 15.12 (the "Forum Selection Clause"), which states, in part, that "[t]he parties agree that any suit . . . based on any matter arising out of or in connection with, this Agreement . . . shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware . . . ." Id. § 15.12.

37.     As detailed below, Kelly is also attempting to use other provisions of the Altered Agreement to oppress Sexton and Gamble.

38.     One such provision includes section 10.05 (the "Unit Purchase Provision"), which states:

> "At any time prior to the consummation of a Change of Control, following the termination of employment or other engagement of any Service Provider with the Company, the Company may, at its election, require the Service Provider . . . to sell to the Company all or any portion of such Service Provider's Units or Incentive Units at the following respective purchase prices:
>
> (i)     For the Restricted Incentive Units, under all circumstances of termination, a price equal to the lesser of their Fair Market Value and One Dollar ($1) (the 'Cause Purchase Price').
>
> (ii)    For the Units or Unrestricted Incentive Units, their Cause Purchase Price, in the event of:
>
> (A)    the termination of such Service Provider's employment or other engagement by the Company for Cause; or
>
> (B)    the resignation of such Service Provider for any reason."

Id. § 10.05.

39.     Another such provision is section 11.02 (the "Restrictive Covenants"), which states that Legacy members, while owning interests in Legacy and for two years thereafter, may not solicit Legacy's employees or clients, and that those members, while owning interest in Legacy and for one year thereafter, may not compete with Legacy. Id. § 11.02.

40.     Kelly is attempting to use the Unit Purchase Provision in section 10.05 and the Restrictive Covenants to freeze Sexton and Gamble out of a sale of Legacy and unlawfully force Sexton and Gamble to terminate their relationship with Legacy.

41.     Kelly employed a similar sign-under-duress tactic regarding Sexton's employment agreement. Kelly presented Sexton with an agreement that was almost unrecognizable in

8

comparison with Sexton's original employment agreement, and Sexton was forced to sign the agreement without sufficient review or corrective recourse in order to avoid Kelly's ultimatum that she must sign or forgo her pay.

**B.**      **Kelly engaged in oppressive and harassing behavior.**

42.      Although Sexton and Gamble were, and remain to be, owners of Legacy, Kelly and Bivacca oppressed both Sexton and Gamble by refusing to disclose to them Legacy's financial records.

43.      After Sexton began her duties as a Legacy employee, Kelly engaged in a litany of oppressive, inappropriate, and harassing behavior toward her.

44.      In the beginning of Sexton's employment with Legacy in May and June of 2017, Kelly repeatedly told Sexton that he owned her, she was "his employee," and he was her "boss," despite the fact that Sexton was one of Legacy's founding members.

45.      Kelly questioned Sexton extensively regarding her after-business-hours locations and waited for her outside of the women's restroom on multiple occasions to begin or continue such questioning.

46.      On one occasion, Sexton informed Kelly that she would arrive late to work the next day in order to transport her daughter to school, but Kelly refused to believe her.

47.      The next morning, as Sexton left her residence, Kelly was waiting outside in his vehicle. Kelly followed Sexton as she transported her daughter to school. Sexton determined not to work that day.

48.      Kelly also harassed Sexton by repeatedly calling her personal phone, day and night. If Sexton did not answer initially, Kelly would continue calling until she did.

49.      In an effort to stop Kelly's behavior, Sexton met with Bivacca, who instructed Kelly not to call Sexton after 6:00 pm and not to call Sexton on the weekends.

9

50.     Despite Bivacca's instructions, Kelly's behavior resumed approximately three weeks later and at a more intolerable level.  Since then, Bivacca has refused to intervene and engaged in misconduct of his own.  For instance, on one occasion, Bivacca called Sexton a "little bitch."  On multiple other occasions, Sexton and Legacy's staff have witnessed Bivacca's mental breakdowns during which he quits his involvement with Legacy, only to return in the days following to renounce his previous termination.

51.     Kelly's phone calls to Sexton increased in number, and Kelly continued to show no regard for the time of day or day of week he called.  Kelly followed these calls with flurries of text messages.

52.     At work, Kelly raised his voice and used profanity toward Sexton, sometimes doing so while "standing over" Sexton to impose his larger physical stature upon her.

53.     On one occasion, Kelly made repeated demands that Sexton return to work early after Sexton undertook major surgery and after she received approval to miss work from Bivacca.

54.     At work, Kelly made degrading statements about Sexton's job performance in the presence of other employees, managers, and staffing contractors.

55.     However, it was Kelly's performance as a Legacy manager that deteriorated, as Kelly often mismanaged Legacy's finances, sometimes purposefully and unethically, and caused it to experience emergencies regarding its loan payments.

56.     Such emergency situations caused Kelly to call Sexton more frequently in attempts to correct his mismanagement, thereafter becoming enraged, raising his voice, and making statements littered with profanity when the situation could not be corrected to his liking.  Kelly would often even threaten to withhold Sexton's paycheck.

10

57.     Kelly's behavior has also been socially inappropriate. When trying to speak with Kelly one workday, Sexton found Kelly watching pornographic material in his office. Kelly made no attempt to hide his activity or apologize to Sexton.

**C.     Kelly, with Bivacca's compliance, used his oppressive tactics to prevent Sexton and Gamble from participating in the sale of Legacy and to cause Legacy to fail.**

58.     In February 2018, Legacy received an offer from a willing and qualified buyer ("Buyer") to purchase Legacy. Buyer made an offer to purchase Legacy for cash payable at closing and an "earnout" payable if Legacy met certain milestones in the months following closing.

59.     Kelly approached Sexton regarding the offer and proposed that he and Bivacca would receive all cash from the sale if Sexton and Gamble agreed to receive the earnout.

60.     Sexton saw this as an opportunity to separate herself from Kelly and the hostile workplace that he had created, and, after discussion with Gamble, sought to accept Kelly's offer.

61.     Upon contacting Kelly to do so, Kelly made a new offer that if Sexton and Gamble wished to consummate the transaction, they would simply have to forfeit their cash proceeds from the sale—a combined 40% interest—to Kelly and receive nothing.

62.     Kelly stated that if Sexton and Gamble did not agree to do so, he would ensure that contracted providers that Sexton and Gamble had brought to Legacy would not get paid, key employees (including Sexton's niece) would be terminated, and that he would decrease Sexton's pay. Indeed, Kelly made clear that Sexton's and Gamble's failure to accept his offer would result in Legacy's destruction. Kelly made these and other threats not only by way of text message conversations with Sexton, but also by way of telephone in the presence of at least one witness.

63.     Kelly's threats were not mere conjecture. Since then, Kelly has caused Legacy to fail to pay its emergency room contractors, has caused approximately 25 of Legacy's vendors and providers to threaten to suspend providing services to Legacy and Legacy's clients and has caused

11

other service providers to completely terminate their contracts with Legacy. One such termination is **attached hereto as Exhibit B**. Kelly's actions have put at risk the patient care provided through Legacy's operation.

64.     Sexton notified Bivacca on multiple occasions of Kelly's ultimatum that she and Gamble relinquish their membership interests or face Legacy's destruction, but Bivacca failed to take any resulting action and permitted Kelly's threats to materialize.

65.     Upon information and belief, Bivacca condoned, was complicit in, and/or encouraged Kelly's plan to destroy Legacy if Sexton and Gamble refused his offer, including approving of Kelly's plan to terminate Legacy employees, decreasing Sexton's pay, and aiding or encouraging Kelly's actions in failing to pay emergency room contractors and otherwise taking actions adverse to the interests of Legacy, Gamble, and Sexton.

66.     Kelly has also engaged in abusive, oppressive, and inappropriate behavior with other Legacy employees, including, but not limited to, deceiving employees to sign employment agreements supported by Kelly's false verbal promises of future ownership in Legacy. Bivacca was apprised of these actions as well, but he continued to allow Kelly's behavior to persist.

67.     With respect to Sexton in her personal capacity, Kelly also stated that her refusal to accept his offer would cause him to "make her life hell." In line with this threat, Kelly has purposefully caused certain Legacy employees to be paid in an untimely manner and fired two employees with whom Sexton was close for the purpose of creating a difficult working environment for Sexton.

68.     Kelly's foregoing actions were not only an attempt to force Sexton and Gamble to accept his offer connected with the sale of the company, but an attempt to get them to quit.

4829-1566-3989.3

69.     Pursuant to the Unit Purchase Provision in section 10.05, if Sexton or Gamble quit, Kelly could purchase their membership interests for $1, each. Ex. A § 10.05.

70.     Pursuant to the Restrictive Covenants in section 11.02, if Kelly purchased Sexton's and Gamble's membership interests, Sexton and Gamble would both allegedly be prohibited from competing with Legacy for one year after Kelly's purchase, and Sexton and Gamble would both allegedly be prevented from soliciting Legacy clients and employees for two years after Kelly's purchase. Id. § 11.02.

71.     Kelly's actions in encouraging Sexton's and Gamble's termination in order to purchase their membership interests for $1 each was an attempted work-around to accomplish his offer in connection with the sale of Legacy to Buyer. In fact, upon information and belief, Kelly has communicated with Bivacca his intent to fire both Sexton and Gamble with the ultimate goal of robbing them of their ownership interests. Bivacca has revealed to Sexton an email in which Kelly explained Kelly's intent to fire Sexton and Gamble and reallocate their shares to Bivacca and Kelly to, upon information and belief, "make [them] rich."

72.     In line with Kelly's attempts to purchase Sexton's and Gamble's ownership interests for de minimus sums, Kelly and/or Bivacca obtained two cashier's checks in the amount of $1,000 each as recently as August 22, 2018 with the intent to purchase Sexton's and Gamble's ownership interests for far less than market value.

73.     Eventually, in conformity with his pattern of oppressive behavior designed to exert control and freeze out Sexton and Gamble, Kelly also terminated Gamble's employment.

74.     Since Gamble's termination, Kelly has refused to pay Gamble wages he earned before termination.

13

75.     Further, despite repeated requests, Kelly and Bivacca have failed to provide Sexton and Gamble both Legacy's complete and accurate financial records, including charts of accounts, transaction histories, and profits and loss statements despite repeated requests, including through counsel.

76.     Moreover, funds have disappeared from Legacy's bank accounts without any explanation or under false pretenses.  For instance, $40,000 that was allocated and debited for the payment of a vendor turned out to be a false account number; the funds remain missing. Kelly had previously told Plaintiffs that he had purchased cyber insurance although the company never obtained a cybersecurity insurance policy.  Kelly and Bivacca had previously been advised that Legacy's computer system and email had been compromised when an account linked to Kelly had been sending out emails to employees and vendors.  Gamble alerted Kelly and Bivacca at the time and furthermore Gamble recommended securing an information technology expert to rectify the situation and secure the system, but Kelly and Bivacca refused.

77.     Bivacca's mismanagement of company funds and/or accounting records has become apparent by way of financial documents that he has sent to various entities that represent different company financial conditions, where proper management would have resulted in the same representations of financial conditions in each instance.

78.     Legacy has also failed to obtain director and officer insurance, despite Kelly's and Bivacca's representations to Sexton and Gamble that Legacy had purchased the same.

79.     More recently, the Company's bank account has been unable to be reconciled, indicating a $125,000 shortfall.

80.     After learning of the imminent filing of this lawsuit, in a desperate attempt to cover up his fraudulent misconduct and financial mismanagement, Kelly purported to terminate Sexton

14

"for cause" via email (**attached hereto as Exhibit C**). Then, because this Court restrained Kelly from completing such termination, Kelly purported to terminate Sexton *without* cause.

81.     Kelly's motive in attempting to terminate Sexton and Gamble, cause or not, is to take their ownership interests under the Unit Purchase Provision, despite his inability to do so because of the provision's invalidity due to Sexton's and Gamble's duress in "agreeing" to it, and despite that Kelly's for-cause termination of Sexton was improper under the Altered Agreement and therefore could not give rise to his ability to purchase her membership interest. Kelly and Bivacca have tendered to Sexton and Gamble the $1,000 checks in an effort to complete such purchase far below fair market value therefore making the attempted buy-out ineffective.

82.     This, and Kelly's and Bivacca's aforementioned conduct, constitute minority oppression and freeze-out prohibited by Tennessee law.

## V.     CAUSES OF ACTION

### COUNT I: REFORMATION OF THE ALTERED AGREEMENT

83.     Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

84.     The Altered Agreement does not fully and accurately reflect the terms of the Original Agreement.

85.     The Altered Agreement does not fully and accurately reflect the terms of the Original Agreement due to Kelly's unilateral mistake in not including Gamble as a Legacy manager, and including the Choice of Law Provision, the Forum Selection Clause, the Unit Purchase Provision, and the Restrictive Covenants in the Altered Agreement.

86.     Kelly fraudulently omitted Gamble's managerial status and fraudulently included the Choice of Law Provision, the Forum Selection Clause, the Unit Purchase Provision, and the

15

Restrictive Covenants in the Altered Agreement and induced Sexton and Gamble into signing it by presenting it to them under duress and without sufficient time for review.

87. Therefore, the parties seek reformation of the Altered Agreement to conform to the Original Agreement, which, among other things, named Gamble as a manager and did not include the Choice of Law Provision, the Forum Selection Clause, the Unit Purchase Provision, and the Restrictive Covenants.

## COUNT II: BREACH OF FIDUCIARY DUTIES
### (DERIVATIVELY ON LEGACY'S BEHALF)

88. Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

89. As managers and members of Legacy, Kelly and Bivacca owe Legacy fiduciary duties of care and loyalty under applicable law and the Original Agreement.

90. Kelly's and Bivacca's mismanagement of the company by willfully and intentionally failing to ensure proper payment of Legacy's contractors, mismanagement of Legacy's funds by being unable to account for certain funds that are missing from Legacy's accounts, and mismanagement of Legacy's accounting records also breached their duties of care to Legacy.

91. Kelly's and Bivacca's breaches have caused Legacy harm by, at least, preventing consummation of Legacy's sale to Buyer and damaging its reputation with its clients.

92. Therefore, Kelly Bivacca are liable to Legacy for breaching fiduciary duties owed it under applicable law.

16

## COUNT III: BREACH OF FIDUCIARY DUTIES (FREEZE OUT)
### (INDIVIDUALLY ON SEXTON'S AND GAMBLE'S BEHALVES)

93.     Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

94.     As managers and members of Legacy, Kelly and Bivacca owe fiduciary duties of care and loyalty to Legacy's other members, including Sexton and Gamble, under applicable law and the Original Agreement.

95.     Kelly and Bivacca, in their capacity as Legacy managers and members, engaged in conduct contrary to Legacy's best interest by oppressing and attempting to freeze out Sexton and Gamble from the sale of Legacy to Buyer, effectively preventing consummation of the sale.

96.     Kelly's and Bivacca's conduct aimed at oppressing Sexton through their harassing behavior, oppressing Gamble by terminating his employment, and Kelly's oppressing Sexton and Gamble by forcing them to give him their proceeds from Legacy's sale are breaches of the duties of care and loyalty Kelly and Bivacca owe to Sexton and Gamble.

97.     Kelly's and Bivacca's breaches have caused Sexton and Gamble harm by preventing their participation in Legacy's sale to Buyer and by preventing the sale altogether.

98.     Therefore, Kelly and Bivacca are liable to Sexton and Gamble for breaching the fiduciary duties owed them under applicable law.

## COUNT IV: BREACH OF CONTRACT
### (INDIVIDUALLY ON GAMBLE'S BEHALF)

99.     Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

100.    Gamble was promised an employment agreement with Legacy.

101.    Kelly, acting on Legacy's behalf, terminated Gamble's employment.

17

102.    The reason for, and substantial factor leading to, Gamble's termination was that Gamble desired to exercise his right to be compensated for his employment, which Kelly desired Legacy to dishonor, and for refusing to relinquish his interest in Legacy to Kelly for a *de minimus* amount.

103.    In order to prevent Gamble from exercising that right, Kelly terminated Gamble's employment.

104.    Kelly's actions have made Legacy liable to Gamble for breach of contract under Tennessee common law.

105.    Gamble seeks damages in an amount representing his the employment wages he has yet to be paid.

## COUNT V: RETALIATORY DISCHARGE
### (INDIVIDUALLY ON SEXTON'S AND GAMBLE'S BEHALVES)

106.    Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

107.    Sexton and Gamble were employees of Legacy who were both discharged as Legacy's employees.

108.    The reason Kelly and Bivacca discharged Sexton and Gamble was to prevent them from vindicating their rights as members of Legacy to seek appointment of a receiver, under Tenn. Code Ann. § 29-1-103, to manage Legacy.

109.    Kelly's and Bivacca's discharges of Sexton and Gamble attempted to prevent them from exercising a statutory or constitutional right, or served to violate clear public policy evidenced in an unambiguous constitutional, statutory, or regulatory provision.

110.    A substantial factor in Kelly's and Bivacca's decision to discharge Sexton and Gamble was their exercise of their protected rights or compliance with clear public policy.

18

111.     Further, Kelly and Bivacca conspired to terminate Sexton and Gamble to force the purchase of their interest in Legacy at far below fair market value.

112.     Kelly and Bivacca are liable to Sexton and Gamble for their retaliatory discharges.

## COUNT VI: DECLARATORY JUDGMENT

113.     Plaintiffs repeat and reallege as if fully set forth herein the allegations set forth in all previous paragraphs.

114.     Kelly's efforts to oppress and coerce Sexton and Gamble into agreeing to his offer are attempts to use the Unit Purchase Provision in a way the parties did not intend.

115.     If Kelly's coercive tactics are successful, they will cause Sexton's termination, and Kelly may be able to use the Restrictive Covenants in a manner the parties did not intend.

116.     Kelly denies that he is using the Unit Purchase Provision and the Restrictive Covenants in an unintended manner, and asserts that they should remain effective.

117.     Further, Kelly and Bivacca tendered a nominal $1,000 for Gamble's and Sexton's interest in Legacy, even though the fair market value of their interest is much higher.  Kelly and Bivacca assert that by paying $1,000, Legacy repurchased Gamble's and Sexton's interest. Because Gamble and Sexton did not receive fair market value for their interest, or anywhere close to that amount, the purported effort to redeem their interest was ineffective, and the Court should order that they remain members of Legacy, retaining all rights in doing so.

118.     Thus, an actual case and controversy exists between the parties.

119.     Therefore, pursuant to Tennessee Rule of Civil Procedure 57, Plaintiffs seek declaratory judgment that the Unit Purchase Provision and the Restrictive Covenants are null and void as applied to them.

120.     Plaintiffs further seek an order stating that they continue to be members of Legacy.

19

WHEREFORE, the Plaintiffs respectfully requests that the Court:

A. Reform the Altered Agreement to reflect the parties' Original Agreement;

B. Declare that the Unit Purchase Provision, Restrictive Covenants, and other rights and obligations contained in the Altered Agreement are void;

C. Declare that Sexton and Gamble continue to be members of Legacy and that the purported repurchases of their membership interests for an amount far below fair market value was ineffective;

D. Award Plaintiffs compensatory damages in an amount not less than $3,000,000 and punitive damages in an amount not less than $12,000,000;

E. Award Gamble all wages to which he is entitled as a result of his employment;

F. Award Sexton and Gamble damages as a result of their retaliatory discharges, including damages resulting from the wrongful purchase of their membership interests for *de minimus* amounts;

G. Award Plaintiffs their attorneys' fees and costs;

H. Grant a jury trial on all issues so triable; and

I. Award Plaintiffs any and all other relief to which they appear entitled.

4829-1566-3989.3

## **VERIFICATION**

I, MICHELE SEXTON, after first being duly sworn, state that I have read the answers to the foregoing interrogatories and hereby verify that the answers thereto are true and correct to the best of my knowledge, information, and belief.

_____
MICHELE SEXTON

STATE OF _Tennessee_ )
                                        )
COUNTY OF _Davidson_ )

Personally appeared before me, _Tracy L. Myers_ , a Notary Public in and for the aforesaid State and County, MICHELE SEXTON, who, after being first duly sworn according to law, did make oath and affirm that he has read the foregoing interrogatories and that the answers provided thereto are true and correct to the best of his knowledge, information, and belief.

Sworn to and subscribed before me on this the _31st_ day of _October_ , 2018.

_Tracy L. Myers_
Notary Public

My Commission Expires: _March 10, 2019_

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS LLP

By: _____
    Russell B. Morgan (No. 20218)
    Jason C. Palmer (No. 36146)
    1600 Division Street, Suite 700
    P.O. Box 340025
    Nashville, Tennessee 37203
    Phone: (615) 252-2311
    Fax: (615) 252-6311
    rmorgan@bradley.com

    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded U.S. Mail and email to counsel for Defendants:

    John S. Hicks
    Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
    211 Commerce Street, Suite 800
    Nashville, Tennessee 37201
    jhicks@bakerdonelson.com

this 31st day of October, 2018.

_____
           Jason C. Palmer

4829-1566-3989.3

# LIMITED LIABILITY COMPANY AGREEMENT

of

## LEGACY PHYSICIAN PARTNERS, LLC
### A DELAWARE LIMITED LIABILITY COMPANY

May 24, 2017

4819-6733-0120 v6
2939908-000001



Table of Contents

**ARTICLE I      DEFINITIONS** ...........................................................................1

    Section 1.01 Definitions.................................................................1

    Section 1.02 Interpretation.............................................................1

**ARTICLE II      ORGANIZATION** .....................................................................1

    Section 2.01 Formation...................................................................1

    Section 2.02 Name..........................................................................2

    Section 2.03 Principal Office............................................................2

    Section 2.04 Registered Office; Registered Agent .............................2

    Section 2.05 Purpose; Powers.........................................................2

    Section 2.06 Term...........................................................................2

    Section 2.07 No State-Law Partnership.............................................2

**ARTICLE III      UNITS** .....................................................................................3

    Section 3.01 Units Generally...........................................................3

    Section 3.02 Authorization and Issuance of Units..............................3

    Section 3.03 Authorization and Issuance of Incentive Units.................3

    Section 3.04 Other Issuances..........................................................5

    Section 3.05 Certification of Units ...................................................5

**ARTICLE IV      MEMBERS**..............................................................................6

    Section 4.01 Admission of New Members .........................................6

    Section 4.02 Representations and Warranties of Members ..................6

    Section 4.03 No Personal Liability ...................................................7

    Section 4.04 No Withdrawal............................................................7

    Section 4.05 Death and Disability ....................................................8

Case 3:18-bk-07868    Doc 63-1    Filed 03/05/19    Entered 03/05/19 10:13:16    Desc
Exhibit     Page 24 of 35

Section 4.06 Voting .................................................................................................8

Section 4.07 Meetings...............................................................................................8

Section 4.08 Quorum ...............................................................................................8

Section 4.09 Action Without Meeting ........................................................................9

Section 4.10 Power of Members.................................................................................9

Section 4.11 No Interest in Company Property ...........................................................9

ARTICLE V     CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS.............................9

Section 5.01 Initial Capital Contributions ...................................................................9

Section 5.02 Additional Capital Contributions.............................................................9

Section 5.03 Maintenance of Capital Accounts............................................................9

Section 5.04 Succession Upon Transfer ....................................................................10

Section 5.05 Negative Capital Accounts ...................................................................10

Section 5.06 No Withdrawal.....................................................................................10

Section 5.07 Treatment of Loans From Members .......................................................10

Section 5.08 Modifications.......................................................................................10

ARTICLE VI     ALLOCATIONS.....................................................................................11

Section 6.01 Allocation of Net Income and Net Loss ................................................11

Section 6.02 Regulatory and Special Allocations.......................................................11

Section 6.03 Tax Allocations....................................................................................12

Section 6.04 Allocations in Respect of Transferred Units...........................................13

Section 6.05 Curative Allocations ............................................................................13

ARTICLE VII     DISTRIBUTIONS...................................................................................13

Section 7.01 General................................................................................................13

Section 7.02 Priority of Distributions .......................................................................13

Section 7.03 Limitations on Distributions to Incentive Units......................................14

ii

4819-6733-0120 v6
2939908-000001

Section 7.04 Tax Advances........................................................................................14

Section 7.05 Tax Withholding; Withholding Advances .......................................15

Section 7.06 Distributions in Kind.........................................................................16

ARTICLE VIII   MANAGEMENT ...........................................................................16

Section 8.01 Establishment of the Board...............................................................16

Section 8.02 Board Composition; Vacancies.........................................................17

Section 8.03 Resignation ........................................................................................17

Section 8.04 Meetings.............................................................................................17

Section 8.05 Manner of Acting; Deadlock ............................................................18

Section 8.06 Action By Written Consent...............................................................18

Section 8.07 Compensation; No Employment.......................................................18

Section 8.08 Officers ..............................................................................................18

Section 8.09 Other Activities of Managers; Business Opportunities ..................19

Section 8.10 No Personal Liability .........................................................................19

ARTICLE IX     PRE-EMPTIVE RIGHTS.............................................................19

Section 9.01 Pre-emptive Right .............................................................................19

ARTICLE X      TRANSFER....................................................................................21

Section 10.01 General Restrictions on Transfer ....................................................21

Section 10.02 Permitted Transfers.........................................................................23

Section 10.03 [Intentionally Omitted] ...................................................................23

Section 10.04 Drag-along Rights ...........................................................................23

Section 10.05 Call Right.........................................................................................26

ARTICLE XI     COVENANTS ...............................................................................28

Section 11.01 Confidentiality .................................................................................28

Section 11.02 Non-Solicitation and Non-Compete ...............................................30

iii

4819-6733-0120 v6
2939908-000001

**ARTICLE XII    ACCOUNTING; TAX MATTERS** .................................................................31

    Section 12.01 Financial Statements ..............................................................31

    Section 12.02 Inspection Rights ...................................................................31

    Section 12.03 Budget ...................................................................................31

    Section 12.04 Tax Matters Member...............................................................31

    Section 12.05 Tax Returns ...........................................................................33

    Section 12.06 Company Funds .....................................................................33

**ARTICLE XIII   DISSOLUTION AND LIQUIDATION** ..........................................................33

    Section 13.01 Events of Dissolution..............................................................33

    Section 13.02 Effectiveness of Dissolution ...................................................33

    Section 13.03 Liquidation ............................................................................33

    Section 13.04 Cancellation of Certificate of Formation ..................................34

    Section 13.05 Survival of Rights, Duties and Obligations ...............................34

    Section 13.06 Recourse for Claims................................................................34

**ARTICLE XIV   EXCULPATION AND INDEMNIFICATION** ................................................35

    Section 14.01 Exculpation of Covered Persons...............................................35

    Section 14.02 Liabilities and Duties of Covered Persons.................................35

    Section 14.03 Indemnification .....................................................................36

    Section 14.04 Survival.................................................................................37

**ARTICLE XV    MISCELLANEOUS** ..............................................................................38

    Section 15.01 Expenses ...............................................................................38

    Section 15.02 Further Assurances.................................................................38

    Section 15.03 Notices ..................................................................................38

    Section 15.04 Headings ...............................................................................38

    Section 15.05 Severability ...........................................................................38

iv

Section 15.06 Entire Agreement ..................................................................39

Section 15.07 Successors and Assigns ........................................................39

Section 15.08 No Third-party Beneficiaries ...............................................39

Section 15.09 Amendment ...........................................................................39

Section 15.10 Waiver ...................................................................................39

Section 15.11 Governing Law ......................................................................40

Section 15.12 Submission to Jurisdiction ...................................................40

Section 15.13 Waiver of Jury Trial .............................................................40

Section 15.14 Equitable Remedies ..............................................................40

Section 15.15 Attorneys' Fees ....................................................................40

Section 15.16 Remedies Cumulative ...........................................................40

Section 15.17 Counterparts .........................................................................41

**APPENDIX A DEFINITIONS** ..................................................................43

**EXHIBIT A FORM OF JOINDER AGREEMENT** ..................................53

**SCHEDULE A MEMBERS SCHEDULE** ..................................................54

4819-6733-0120 v6
2939908-000001

# LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement of Legacy Physician Partners, LLC, a Delaware limited liability company (the "**Company**"), is entered into as of May 24, 2017 by and among the Company, the Initial Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement.

## RECITALS

**WHEREAS**, the Company was formed under the laws of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on February 21, 2017 (the "**Certificate of Formation**");

**WHEREAS**, the Members wish to enter this Agreement setting forth the terms and conditions governing the operation and management of the Company; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in <u>Appendix A</u>:

**Section 1.02 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ORGANIZATION

**Section 2.01 Formation.**

(a)    The Company was formed on February 21, 2017, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

1

4819-6733-0120 v6
2939908-000001

(b)     This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

**Section 2.02  Name.**  The name of the Company is "Legacy Physician Partners, LLC" or such other name or names as the Board may from time to time designate; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC." The Board shall give prompt notice to each of the Members of any change to the name of the Company.

**Section 2.03  Principal Office.**  The principal office of the Company is located at 210 Paddock Lane, Nashville, TN 37205, or such other place as may from time to time be determined by the Board.

**Section 2.04  Registered Office; Registered Agent.**

(a)     The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)     The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Board may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.05  Purpose; Powers.**

(a)     The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 2.06  Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.07  No State-Law Partnership.**  The Members intend that the Company shall shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or Officer of the Company shall be a partner or joint

2

4819-6733-0120 v6
2939908-000001

venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.05.

## ARTICLE III
## UNITS

**Section 3.01 Units Generally.** The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Subject to compliance with Section 9.01 and Section 10.01(b), each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, as determined by the Board with respect to such type, class or series. The Board shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Members Schedule as of the execution of this Agreement is attached hereto as **Schedule A.**

**Section 3.02 Authorization and Issuance of Units.** Subject to compliance with Section 9.01 and 10.01(b), as of the date hereof, the issued and outstanding Units are set forth on the Members Schedule opposite each Member's name.

**Section 3.03 Authorization and Issuance of Incentive Units.**

(a) The Board is hereby authorized to issue Incentive Units to Managers, Officers, employees, consultants or other service providers of the Company (collectively, "**Service Providers**"). As of the date hereof, there are no Incentive Units issued and outstanding in the amounts set forth on the Members Schedule opposite each Member's name. The Board is hereby authorized and directed to adopt a written plan pursuant to which all Incentive Units shall be granted in compliance with Rule 701 of the Securities Act or another applicable exemption (such plan as in effect from time to time, the "**Incentive Plan**"). In connection with the adoption of the Incentive Plan and issuance of Incentive Units, the Board is hereby authorized to negotiate and enter into award agreements with each Service Provider to whom it grants Incentive Units (such agreements, "**Award Agreements**"). Each Award Agreement shall include such terms, conditions, rights and obligations as may be determined by the Board, in its sole discretion, consistent with the terms herein.

(b) The Board shall establish such vesting criteria for the Incentive Units as it determines in its discretion and shall include such vesting criteria in the Incentive Plan and/or the applicable Award Agreement for any grant of Incentive Units. As of the date hereof, none of the issued and outstanding Incentive Units shall be deemed vested. As used in this Agreement:

(i) any Incentive Units that have not vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Restricted Incentive Units**"; and

(ii) any Incentive Units that have vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Unrestricted Incentive Units.**"

3

4819-6733-0120 v6
2939908-000001

(c)    Immediately prior to each subsequent issuance of Incentive Units following the initial issuance, the Board shall determine in good faith the Incentive Liquidation Value.  In each Award Agreement that the Company enters into with a Service Provider for the issuance of new Incentive Units, the Board shall include an appropriate Profits Interest Hurdle for such Incentive Units on the basis of the Incentive Liquidation Value immediately prior to the issuance of such Incentive Units.

(d)    The Company and each Member hereby acknowledge and agree that, with respect to any Service Provider, such Service Provider's Incentive Units constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27 (a "**Profits Interest**"), and that any and all Incentive Units received by a Service Provider are received in exchange for the provision of services by the Service Provider to or for the benefit of the Company in a Service Provider capacity or in anticipation of becoming a Service Provider. The Company and each Service Provider who receives Incentive Units hereby agree to comply with the provisions of Rev. Proc. 2001-43, and neither the Company nor any Service Provider who receives Incentive Units shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43 or any future Internal Revenue Service guidance or other Governmental Authority that supplements or supersedes the foregoing Revenue Procedures.

(e)    Incentive Units shall receive the following tax treatment:

(i)    the Company and each Service Provider who receives Incentive Units shall treat such Service Provider as the owner of such Incentive Units from the date of their receipt, and the Service Provider receiving such Incentive Units shall take into account his Distributive share of Net Income, Net Loss, income, gain, loss and deduction associated with the Incentive Units in computing such Service Provider's income tax liability for the entire period during which such Service Provider holds the Incentive Units.

(ii)    each Service Provider that receives Incentive Units shall make a timely and effective election under Code Section 83(b) with respect to such Incentive Units and shall promptly provide a copy to the Company. Except as otherwise determined by the Board, both the Company and all Members shall (A) treat such Incentive Units as outstanding for tax purposes, (B) treat such Service Provider as a partner for tax purposes with respect to such Incentive Units and (C) file all tax returns and reports consistently with the foregoing. Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the receipt of such Incentive Units for federal income tax purposes.

(iii)    in accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, each Member, by executing this Agreement, authorizes and directs the Company to elect a safe harbor under which the fair market

Case 3:18-bk-07868    Doc 63-1    Filed 03/05/19    Entered 03/05/19 10:13:16    Desc
Exhibit    Page 32 of 35

value of any Incentive Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the Incentive Units as of the date of issuance of such Incentive Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to Transfers of Units while the safe harbor election remains effective.

(f)     For the avoidance of doubt, Incentive Units shall not have any pre-emptive right to acquire New Securities pursuant to Section 9.01(a).

Section 3.04  Other Issuances. In addition to the Units and Incentive Units, the Board is hereby authorized, subject to compliance with Section 9.01 and Section 10.01(b), to authorize and issue or sell to any Person any of the following (collectively, "New Interests"): (i) any new type, class or series of equity not otherwise described in this Agreement, such equity may be designated as classes or series of preferred, common or incentive Units with different rights than currently exist; and (ii) Unit Equivalents. The Board is hereby authorized, subject to Section 15.09, to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations and rights of any such New Interests, including the number of such New Interests to be issued, the preference (with respect to Distributions, in liquidation or otherwise) over any other Units and any contributions required in connection therewith.

Section 3.05  Certification of Units.

(a)     The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)     In the event that the Board shall issue certificates representing Units in accordance with Section 3.05(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE

5

SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
## MEMBERS

**Section 4.01  Admission of New Members.**

(a)      Upon approval of the Board, new Members may be admitted from time to time (i) in connection with an issuance of Units by the Company, subject to compliance with the provisions of Section 9.01 and Section 10.01(b), as applicable, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of ARTICLE X, and in either case, following compliance with the provisions of Section 4.01(b). .

(b)      In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Board and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Board shall also adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

**Section 4.02  Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a)      The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)      Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)      Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)      Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects

6

4819-6733-0120 v6
2939908-000001

of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company for such purpose;

(e)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company that may have been made or given by any other Member or by any agent or employee of any other Member;

(f)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(g)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h)     The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(i)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(j)     Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or affect the right of the Company to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company, if applicable.

(k)     None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any Award Agreement, as may be applicable.

Section 4.03   No Personal Liability. Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04   No Withdrawal. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member; provided, however, that this Agreement shall continue to apply with respect to any Units that

7

4819-6733-0120 v6
2939908-000001